381 U.S. 676 (1965)
LOCAL UNION NO. 189, AMALGAMATED MEAT CUTTERS & BUTCHER WORKMEN OF NORTH AMERICA, AFL-CIO, ET AL.
v.
JEWEL TEA CO., INC.
No. 240.
Supreme Court of United States.
Argued January 27-28, 1965.
Decided June 7, 1965.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.
*679 Bernard Dunau argued the cause for petitioners. With him on the briefs were Lester Asher, Leo Segall and Robert C. Eardley.
George B. Christensen argued the cause for respondent. With him on the brief were Fred H. Daugherty, Theodore A. Groenke and Samuel Weisbard.
Solicitor General Cox, by special leave of Court, argued the cause for the United States, as amicus curiae, urging reversal. With him on the brief were Assistant Attorney General Orrick, Robert J. Hoerner, Charles Donahue and Arnold Ordman.
Briefs of amici curiae, urging affirmance, were filed by Allen A. Lauterbach for the American Farm Bureau Federation; by Edwin H. Pewett, Jonathan W. Sloat and George A. Avery for the National Independent Meat Packers Association, and by Allen Whitfield for the National Livestock Feeders Association et al.
MR. JUSTICE WHITE announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and MR. JUSTICE BRENNAN join.
Like No. 48, United Mine Workers v. Pennington, decided today, ante, p. 657, this case presents questions regarding the application of §§ 1 and 2 of the Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2 (1958 ed.), to activities of labor unions. In particular, it concerns the lawfulness of the following restriction on the operating hours of food store meat departments contained in a collective bargaining agreement executed after joint multi-employer, multi-union negotiations:
"Market operating hours shall be 9:00 a. m. to 6:00 p. m. Monday through Saturday, inclusive. No customer *680 shall be served who comes into the market before or after the hours set forth above."
This litigation arose out of the 1957 contract negotiations between the representatives of 9,000 Chicago retailers of fresh meat and the seven union petitioners, who are local affiliates of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, representing virtually all butchers in the Chicago area. During the 1957 bargaining sessions the employer group presented several requests for union consent to a relaxation of the existing contract restriction on marketing hours for fresh meat, which forbade the sale of meat before 9 a. m. and after 6 p. m. in both service and self-service markets.[1] The unions rejected all such suggestions, and their own proposal retaining the marketing-hours restriction was ultimately accepted at the final bargaining session by all but two of the employers, National Tea Co. and Jewel Tea Co. (hereinafter "Jewel"). Associated Food Retailers of Greater Chicago, a trade association having about 1,000 individual and independent merchants as members and representing some 300 meat dealers in the negotiations, was among those who accepted. Jewel, however, asked the union negotiators to present to their membership, on behalf of it and National Tea, a counteroffer that included provision for Friday night operations. At the same time Jewel voiced its *681 belief, as it had midway through the negotiations that any marketing-hours restriction was illegal. On the recommendation of the union negotiators, the Jewel offer was rejected by the union membership, and a strike was authorized. Under the duress of the strike vote, Jewel decided to sign the contract previously approved by the rest of the industry.
In July 1958 Jewel brought suit against the unions, certain of their officers, Associated, and Charles H. Bromann, Secretary-Treasurer of Associated, seeking invalidation under §§ 1 and 2 of the Sherman Act of the contract provision that prohibited night meat market operations. The gist of the complaint was that the defendants and others had conspired together to prevent the retail sale of fresh meat before 9 a. m. and after 6 p. m. As evidence of the conspiracy Jewel relied in part on the events during the 1957 contract negotiationsthe acceptance by Associated of the market-hours restriction and the unions' imposition of the restriction on Jewel through a strike threat. Jewel also alleged that it was a part of the conspiracy that the unions would neither permit their members to work at times other than the hours specified nor allow any grocery firm to sell meat, with or without employment of their members, outside those hours; that the members of Associated, which had joined only one of the 1957 employer proposals for extended marketing hours, had agreed among themselves to insist on the inclusion of the marketing-hours limitation in all collective bargaining agreements between the unions and any food store operator; that Associated, its members and officers had agreed with the other defendants that no firm was to be permitted to operate self-service meat markets between 6 p. m. and 9 p. m.; and that the unions, their officers and members had acted as the enforcing agent of the conspiracy.
*682 The complaint stated that in recent years the prepackaged, self-service system of marketing meat had come into vogue, that 174 of Jewel's 196 stores were equipped to vend meat in this manner, and that a butcher need not be on duty in a self-service market at the time meat purchases were actually made. The prohibition of night meat marketing, it was alleged, unlawfully impeded Jewel in the use of its property and adversely affected the general public in that many persons find it inconvenient to shop during the day. An injunction, treble damages and attorneys' fees were demanded.
The trial judge held the allegations of the complaint sufficient to withstand a motion to dismiss made on the grounds, inter alia, that (a) the alleged restraint was within the exclusive regulatory scope of the National Labor Relations Act and was therefore outside the jurisdiction of the Court and (b) the controversy was within the labor exemption to the antitrust laws. That ruling was sustained on appeal. Jewel Tea Co. v. Local Unions Nos. 189, etc., Amalgamated Meat Cutters, AFL-CIO, 274 F. 2d 217 (C. A. 7th Cir. 1960), cert. denied, 362 U. S. 936. After trial, however, the District Judge ruled the "record was devoid of any evidence to support a finding of conspiracy" between Associated and the unions to force the restrictive provision on Jewel. 215 F. Supp. 839, 845. Testing the unions' action standing alone, the trial court found that even in self-service markets removal of the limitation on marketing hours either would inaugurate longer hours and night work for the butchers or would result in butchers' work being done by others unskilled in the trade. Thus, the court concluded, the unions had imposed the marketing-hours limitation to serve their own interests respecting conditions of employment, and such action was clearly within the labor exemption of the Sherman Act established by Hunt v. Crumboch, 325 U. S. 821; United States v. Hutcheson, 312 U. S. 219; United States *683 v. American Federation of Musicians, 318 U. S. 741. Alternately, the District Court ruled that even if this was not the case, the arrangement did not amount to an unreasonable restraint of trade in violation of the Sherman Act.
The Court of Appeals reversed the dismissal of the complaint as to both the unions and Associated. Without disturbing the District Court's finding that, apart from the contractual provision itself, there was no evidence of conspiracy, the Court of Appeals concluded that a conspiracy in restraint of trade had been shown. The court noted that "[t]he rest of the Industry agreed with the Defendant Local Unions to continue the ban on night operations," while plaintiff resisted, and concluded that Associated and the unions "entered into a combination or agreement, which constituted a conspiracy, as charged in the complaint. . . [w]hether it be called an agreement, a contract or a conspiracy, is immaterial." 331 F. 2d 547, 551.
Similarly, the Court of Appeals did not find it necessary to review the lower court's finding that night marketing would affect either the butchers' working hours or their jurisdiction, for the court held that an employer-union contract respecting working hours would be unlawful. "One of the proprietary functions is the determination of what days a week and what hours of the day the business will be open to supply its customers. . . . As long as all rights of employees are recognized and duly observed by the employer, including the number of hours per day that any one shall be required to work, any agreement by a labor union, acting in concert with business competitors of the employer, designed to interfere with his operation of a retail business . . . is a violation of the Sherman Act . . . . [T]he furnishing of a place and advantageous hours of employment for the butchers to *684 supply meat to customers are the prerogatives of the employer." 331 F. 2d 547, 549.
We granted certiorari on the unions' petition,[2] 379 U. S. 813,[3] and now reverse the Court of Appeals.

I.
We must first consider the unions' attack on the appropriateness of the District Court's exercise of jurisdiction, which is encompassed in their contention that this controversy is within the exclusive primary jurisdiction of the National Labor Relations Board. On this point, which is distinct from the unions' argument that the operating-hours restriction is subject to regulation only by the Board and is thus wholly exempt from the antitrust laws, the unions' thesis is that the pivotal issue is whether the operating-hours restriction is a "term or condition of employment" and that the District Court should have held the case on its docket pending a Board proceeding to resolve that issue, which is said to be peculiarly within the competence of the Board.
"The doctrine of primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes *685 into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." United States v. Western Pac. R. Co., 352 U. S. 59, 63-64. The doctrine is based on the principle "that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over," Far East Conference v. United States, 342 U. S. 570, 574, and "requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme," United States v. Philadelphia Nat. Bank, 374 U. S. 321, 353.
Whether a proposed bargaining subject is a term or condition of employment is an issue that the Board frequently determines in considering charges that an employer or union has violated the duty to bargain in good faith concerning "wages, hours, and other terms and conditions of employment," the mandatory subjects of bargaining described in § 8 (d) of the National Labor Relations Act, 49 Stat. 452, as amended. Such an issue may be raised by an unfair labor practice charge of violation of § 8 (a) (5) or § 8 (b) (3) through, for example, a refusal to bargain on a mandatory subject of bargaining, see Labor Board v. Katz, 369 U. S. 736, or insistence on a nonmandatory subject, see Labor Board v. Borg-Warner Corp., 356 U. S. 342. Thus, the unions contend, Jewel could have filed an unfair labor practice charge with the Board on the ground that the unions had insisted on a nonmandatory subjectthe marketing-hours restriction. Obviously, classification of bargaining subjects as "terms *686 or conditions of employment" is a matter concerning which the Board has special expertise. Nevertheless, for the reasons stated below we cannot conclude that this is a proper case for application of the doctrine of primary jurisdiction.
To begin with, courts are themselves not without experience in classifying bargaining subjects as terms or conditions of employment. Just such a determination must be frequently made when a court's jurisdiction to issue an injunction affecting a labor dispute is challenged under the Norris-LaGuardia Act, which defines "labor dispute" as including "any controversy concerning terms or conditions of employment," Norris-LaGuardia Act, § 13 (c), 47 Stat. 73, 29 U. S. C. § 113 (c) (1958 ed.). See Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U. S. 330; Bakery Drivers Union v. Wagshal, 333 U. S. 437; cf. Teamsters Union v. Oliver, 358 U. S. 283.
Secondly, the doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to "an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency." Maritime Board v. Isbrandtsen Co., 356 U. S. 481, 521 (Frankfurter, J., dissenting). It was only after commencement of trial that it became evident that a major issue in this case would be whether the marketing-hours restriction was a term or condition of employment. Jewel's complaint alleged the existence of a conspiracy between Associated and the unions to impose the marketing-hours provision on Jewelthat is, it was alleged that the unions had agreed with a part of the bargaining unit to impose certain terms on the rest of the unit. We hold today in United Mine Workers v. Pennington with respect to allegations of a similar employer-union agreement to *687 impose a particular scale of wagesindisputably at the core of "wages, hours, and other terms and conditions of employment"that such an understanding is not exempt from the Sherman Act. At the stage when the decision whether to refer the parties to the Board was made, therefore, the issues were so framed that a Board determination would have been of subsidiary importance at best.
Finally, we must reject the unions' primary-jurisdiction contention because of the absence of an available procedure for obtaining a Board determination. The Board does not classify bargaining subjects in the abstract but only in connection with unfair labor practice charges of refusal to bargain. The typical antitrust suit, however, is brought by a stranger to the bargaining relationship, and the complaint is not that the parties have refused to bargain but, quite the contrary, that they have agreed. Jewel's conspiracy allegation in the present case was just such a complaint. Agreement is of course not a refusal to bargain, and in such cases the Board affords no mechanism for obtaining a classification of the subject matter of the agreement. Moreover, even in the few instances when the antitrust action could be framed as a refusal to bargain charge, there is no guarantee of Board action. It is the function of the Board's General Counsel rather than the Board or a private litigant to determine whether an unfair labor practice complaint will ultimately issue. National Labor Relations Act, § 3 (d), 29 U. S. C. § 153 (d) (1958 ed.). And the six-month limitation period of § 10 (b) of the Act, 29 U. S. C. § 160 (b) (1958 ed.). would preclude many litigants from even filing a charge with the General Counsel. Indeed, Jewel's complaint in this very case was filed more than six months after it signed the 1957 collective bargaining agreement. "[W]e know of no case where the court has ordered reference of an issue which the administrative body would not itself *688 have jurisdiction to determine in a proceeding for that purpose." Montana Dakota Utilities Co. v. Northwestern Public Serv. Co., 341 U. S. 246, 254.[4]

II.
Here, as in United Mine Workers v. Pennington, ante, p. 657, the claim is made that the agreement under attack is exempt from the antitrust laws. We agree, but not on the broad grounds urged by the union.
It is well at the outset to emphasize that this case comes to us stripped of any claim of a union-employer conspiracy against Jewel. The trial court found no evidence to sustain Jewel's conspiracy claim and this finding was not disturbed by the Court of Appeals. We therefore have a situation where the unions, having obtained a marketing-hours agreement from one group of employers, have successfully sought the same terms from a single employer, Jewel, not as a result of a bargain between the unions and some employers directed against other employers, but pursuant to what the unions deemed to be in their own labor union interests.
Jewel does not allege that it has been injured by the elimination of competition among the other employers within the unit with respect to marketing hours; Jewel complains only of the unions' action in forcing it to accept the same restriction, the unions acting not at the behest of any employer group but in pursuit of their own policies. It might be argued that absent any union-employer conspiracy against Jewel and absent any agreement between Jewel and any other employer, the union-Jewel contract cannot be a violation of the Sherman Act. But the issue *689 before us is not the broad substantive one of a violation of the antitrust lawswas there a conspiracy or combination which unreasonably restrained trade or an attempt to monopolize and was Jewel damaged in its business?but whether the agreement is immune from attack by reason of the labor exemption from the antitrust laws. See note 3, supra. The fact that the parties to the agreement are but a single employer and the unions representing its employees does not compel immunity for the agreement. We must consider the subject matter of the agreement in the light of the national labor policy. Cf. Bakery Drivers Union v. Wagshal, 333 U. S. 437.
We pointed out in Pennington that exemption for union-employer agreements is very much a matter of accommodating the coverage of the Sherman Act to the policy of the labor laws. Employers and unions are required to bargain about wages, hours and working conditions, and this fact weighs heavily in favor of antitrust exemption for agreements on these subjects. But neither party need bargain about other matters and either party commits an unfair labor practice if it conditions its bargaining upon discussions of a nonmandatory subject. Labor Board v. Borg-Warner Corp., 356 U. S. 342. Jewel, for example, need not have bargained about or agreed to a schedule of prices at which its meat would be sold and the unions could not legally have insisted that it do so. But if the unions had made such a demand, Jewel had agreed and the United States or an injured party had challenged the agreement under the antitrust laws, we seriously doubt that either the unions or Jewel could claim immunity by reason of the labor exemption, whatever substantive questions of violation there might be.
Thus the issue in this case is whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision *690 through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.[5] We think that it is.
The Court of Appeals would classify the marketing-hours restriction with the product-pricing provision and place both within the reach of the Sherman Act. In its view, labor has a legitimate interest in the number of hours it must work but no interest in whether the hours fall in the daytime, in the nighttime or on Sundays. "[T]he furnishing of a place and advantageous hours of employment for the butchers to supply meat to customers are the prerogatives of the employer." 331 F. 2d 547, 549. That reasoning would invalidate with respect to both service and self-service markets the 1957 provision that "eight hours shall constitute the basic work day. Monday through Saturday; work to begin at 9:00 a. m. *691 and stop at 6:00 p. m. . . ." as well as the marketing-hours restriction.
Contrary to the Court of Appeals, we think that the particular hours of the day and the particular days of the week during which employees shall be required to work are subjects well within the realm of "wages, hours, and other terms and conditions of employment" about which employers and unions must bargain. National Labor Relations Act, § 8 (d); see Timken Roller Bearing Co., 70 N. L. R. B. 500, 504, 515-516, 521 (1946), rev'd on other grounds, 161 F. 2d 949 (C. A. 6th Cir. 1947) (employer's unilateral imposition of Sunday work was refusal to bargain); Massey Gin & Machine Works, Inc., 78 N. L. R. B. 189, 195, 199 (1948) (change in starting and quitting time); Camp & McInnes, Inc., 100 N. L. R. B. 524, 532 (1952) (reduction of lunch hour and advancement of quitting time). And, although the effect on competition is apparent and real, perhaps more so than in the case of the wage agreement, the concern of union members is immediate and direct. Weighing the respective interests involved, we think the national labor policy expressed in the National Labor Relations Act places beyond the reach of the Sherman Act union-employer agreements on when, as well as how long, employees must work. An agreement on these subjects between the union and the employers in a bargaining unit is not illegal under the Sherman Act, nor is the union's unilateral demand for the same contract of other employers in the industry.
Disposing of the case, as it did, on the broad grounds we have indicated, the Court of Appeals did not deal separately with the marketing-hours provision, as distinguished from hours of work, in connection with either service or self-service markets. The dispute here pertains principally to self-service markets.
*692 The unions argue that since night operations would be impossible without night employment of butchers, or an impairment of the butchers' jurisdiction, or a substantial effect on the butchers' workload, the marketing-hours restriction is either little different in effect from the valid working-hours provision that work shall stop at 6 p. m. or is necessary to protect other concerns of the union members. If the unions' factual premises are true, we think the unions could impose a restriction on night operations without violation of the Sherman Act; for then operating hours, like working hours, would constitute a subject of immediate and legitimate concern to union members.
Jewel alleges on the other hand that the night operation of self-service markets requires no butcher to be in attendance and does not infringe any other legitimate union concern. Customers serve themselves; and if owners want to forgo furnishing the services of a butcher to give advice or to make special cuts, this is not the unions' concern since their desire to avoid night work is fully satisfied and no other legitimate interest is being infringed. In short, the connection between working hours and operating hours in the case of the self-service market is said to be so attenuated as to bring the provision within the prohibition of the Sherman Act.
If it were true that self-service markets could actually operate without butchers, at least for a few hours after 6 p. m., that no encroachment on butchers' work would result and that the workload of butchers during normal working hours would not be substantially increased. Jewel's position would have considerable merit. For then the obvious restraint on the product marketthe exclusion of self-service stores from the evening market for meatwould stand alone, unmitigated and unjustified by the vital interests of the union butchers which are relied upon in this case. In such event the limitation imposed *693 by the unions might well be reduced to nothing but an effort by the unions to protect one group of employers from competition by another, which is conduct that is not exempt from the Sherman Act. Whether there would be a violation of §§ 1 and 2 would then depend on whether the elements of a conspiracy in restraint of trade or an attempt to monopolize had been proved.[6]
*694 Thus the dispute between Jewel and the unions essentially concerns a narrow factual question: Are might operations without butchers, and without infringement of butchers' interests, feasible? The District Court resolved this factual dispute in favor of the unions. It found that "in stores where meat is sold at night it is impractical to operate without either butchers or other employees. Someone must arrange, replenish and clean the counters and supply customer services." Operating without butchers would mean that "their work would be done by others unskilled in the trade," and "would involve an increase in workload in preparing for the night work and cleaning the next morning." 215 F. Supp., at 846. Those findings were not disturbed by the Court of Appeals, which, as previously noted, proceeded on a broader ground. Our function is limited to reviewing the record to satisfy ourselves that the trial judge's findings are not clearly erroneous. Fed. Rules Civ. Proc. 52 (a).
The trial court had before it evidence concerning the history of the unions' opposition to night work, the development of the provisions respecting night work and night operations, the course of collective bargaining negotiations in 1957, 1959, and 1961[7] with regard to those provisions, and the characteristics of meat marketing insofar as they bore on the feasibility of night operations without butchers.
The unions' opposition to night work has a long history. Prior to 1919 the operating hours of meat markets in Chicago were 7 a. m. to 7 p. m., Monday through Friday; *695 7 a. m. to 10 p. m. on Saturday, and 7 a. m. to 1 p. m. on Sunday. Butchers worked the full 81-hour, seven-day week. The Chicago butchers' strike of 1919 was much concerned with shortening working hours, and the resulting contract, signed in 1920, set the working day at 8 a. m. to 6 p. m., Monday through Friday, and 8 a. m. to 9 p. m. on Saturday. Various alterations in the hours were made in 1937, 1941, 1945, 1946, and again in 1947, when the present working hours (9 a. m. to 6 p. m., Monday through Saturday) were established. In a mail ballot conducted by the unions in October 1962, Jewel's meat cutters voted 759 to 28 against night work.
Concomitant with the unions' concern with the working hours of butchers was their interest in the hours during which customers might be served. The 1920 agreement provided that "no customers will be served who come into the market after 6 P. M. and 9 P. M. on Saturdays and on days preceding holidays . . . ." That provision was continued until 1947, when it was superseded by the formulation presently in effect and here claimed to be unlawful:
"Market operating hours shall be 9:00 a. m. to 6:00 p. m. Monday through Saturday, inclusive. No customer shall be served who comes into the market before or after the hours set forth above."
In 1947, Jewel had just started investigating the self-service method of meat vending. It introduced that method in the Chicago area in 1948 and in the territory of these unions in 1953.
During the 1957 negotiations numerous proposals for relaxation of the operating-hours restriction were presented by the employer group. Each of these proposals, including that submitted separately by Jewel for consideration at the unions' ratification meetings, combined a provision for night operations with a provision for a more flexible workday that would permit night employment *696 of butchers. Such juxtaposition of the two provisions could, of course, only serve to reinforce the unions' fears that night operations meant night work. Jewel did allege in its complaint, filed in July 1958, that night operations were possible without butchers, but even in the 1959 bargaining sessions Jewel failed to put forth any plan for night operations that did not also include night work. Finally, toward the end of the 1961 negotiations. Jewel did make such a suggestion, but, as the trial judge remarked, the "unions questioned the seriousness of that proposal under the circumstances." 215 F. Supp., at 843.
The unions' evidence with regard to the practicability of night operations without butchers was accurately summarized by the trial judge as follows:
"[I]n most of plaintiff's stores outside Chicago, where night operations exist, meat cutters are on duty whenever a meat department is open after 6 P. M. . . . Even in self-service departments, ostensibly operated without employees on duty after 6 P. M., there was evidence that requisite customer services in connection with meat sales were performed by grocery clerks. In the same vein, defendants adduced evidence that in the sale of delicatessen items, which could be made after 6 P. M. from self-service cases under the contract, `practically' always during the time the market was open the manager or other employees, would be rearranging and restocking the cases. There was also evidence that even if it were practical to operate a self-service meat market after 6 P. M. without employees, the night operations would add to the workload in getting the meats prepared for night sales and in putting the counters in order the next day." 215 F. Supp., at 844.
*697 Jewel challenges the unions' evidence on each of these pointsarguing, for example, that its preference to have butchers on duty at night, where possible under the union contract, is not probative of the feasibility of not having butchers on duty and that the evidence that grocery clerks performed customer services within the butchers' jurisdiction was based on a single instance resulting from "entrapment" by union agents. But Jewel's argument when considered against the historical background of union concern with working hours and operating hours and the virtually uniform recognition by employers of the intimate relationship between the two subjects, as manifested by bargaining proposals in 1957, 1959, and 1961 falls far short of a showing that the trial judge's ultimate findings were clearly erroneous.
Reversed.
MR. JUSTICE GOLDBERG, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting from the opinion but concurring in the reversal in No. 48 and concurring in the judgment of the Court in No. 240.
Stripped of all the pejorative adjectives and reduced to their essential facts, both Pennington and Jewel Tea represent refusals by judges to give full effect to congressional action designed to prohibit judicial intervention via the antitrust route in legitimate collective bargaining. The history of these cases furnishes fresh evidence of the observation that in this area, necessarily involving a determination of "what public policy in regard to the industrial struggle demands," Duplex Co. v. Deering, 254 U. S. 443, 479, 485 (dissenting opinion of Mr. Justice Brandeis), "courts have neither the aptitude nor the criteria for reaching sound decisions." Cox, Labor and the Antitrust LawsA Preliminary Analysis, 104 U. Pa. L. Rev. 252, 269-270 (1955); see Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L. J. 14 (1963).

*698 I.
Pennington presents a case of a union negotiating with the employers in the industry for wages, fringe benefits, and working conditions. Despite allegations of conspiracy, which connotes clandestine activities, it is no secret that the United Mine Workers, acting to further what it considers to be the best interests of its members, espouses a philosophy of achieving uniform high wages, fringe benefits, and good working conditions. As the quid pro quo for this, the Union is willing to accept the burdens and consequences of automation. Further, it acts upon the view that the existence of marginal operators who cannot afford these high wages, fringe benefits, and good working conditions does not serve the best interests of the working miner but, on the contrary, depresses wage standards and perpetuates undesirable conditions. This has been the articulated policy of the Union since 1933. See Baratz, The Union and the Coal Industry 62-74 (1955). The Mine Workers has openly stated its preference, if need be, for a reduced working force in the industry, with those employed working at high wages, rather than for greater total employment at lesser wage rates. Ibid. See also Folliard, Roar of John L. Lewis Subdued at 85, The Washington Post, Feb. 14. 1965, § E, p. 3; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare on S. Res. 274, 81st Cong., 2d Sess., 1-10; Hearings before a Subcommittee of the House Committee on Education and Labor, Welfare of Miners, 80th Cong., 1st Sess.; 1 Proceedings of Forty-Second Consecutive Constitutional Convention of the United Mine Workers of America. 9-14 (1956). Consistent with this view, the Union welcomes automation, insisting only that the workers participate in its benefits.[1]
*699 Jewel Tea presents another and different aspect of collective bargaining philosophy. The Chicago Local of the Amalgamated Meat Cutters bargains for its members with small, independent service butchers as well as large automated self-service chains. It seeks from both a uniform policy that no fresh meat be sold after 6 p. m. This union policy, as my Brother WHITE recognizes, ante, at 694-696, has a long history dating back to 1919 and has grown out of the Union's struggle to reduce the long, arduous hours worked by butchers, which in 1919 were 81 hours per week. It took a long strike to achieve the first limitation on hours in 1920, and it has required hard extensive collective bargaining since then to maintain the policy and further reduce the number of hours worked. While it is claimed by Jewel Tea, a large operator of automated self-service markets, that it can operate beyond the set hours without increasing the work of butchers or having others do butchers' worka claim rejected by the trial court and the majority of this Courtit is conceded, on this record, that the small, independent service operators cannot do so. Therefore to the extent that the Union's uniform policy limiting hours of selling fresh meat has the effect of aiding one group of employers at the expense of another, here the union policy, unlike that in Pennington, aids the small employers at the expense of the large.
Although evidencing these converse economic effects, both Pennington and Jewel Tea, as the Court in Pennington, and my Brother WHITE'S opinion in Jewel Tea *700 acknowledge, involve conventional collective bargaining on wages, hours, and working conditionsmandatory subjects of bargaining under the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. § 158 (d) (1958 ed.). Yet the Mine Workers' activity in Pennington was held subject to an antitrust action by two lower courts. This decision was based upon a jury determination that the Union's economic philosophy is undesirable, and it resulted in an award against the Union of treble damages of $270,000 and $55,000 extra for respondent's attorney's fees. In Jewel Tea, the Union has also been subjected to an antitrust suit in which a court of appeals, with its own notions as to what butchers are legitimately interested in, would subject the Union to a treble damage judgment in an as yet undetermined amount.
Regretfully these cases, both in the lower courts and in expressions in the various opinions filed today in this Court, as I shall demonstrate, constitute a throwback to past days when courts allowed antitrust actions against unions and employers engaged in conventional collective bargaining, because "a judge considered" the union or employer conduct in question to be "socially or economically" objectionable. Duplex Co. v. Deering, supra, at 485 (dissenting opinion of Mr. Justice Brandeis). It is necessary to recall that history to place the cases before us in proper perspective.

II.
The Sherman Act, 26 Stat. 209, 15 U. S. C. § 1 et seq. (1958 ed.), "was enacted in the era of `trust' and of `combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." Apex Hosiery Co. v. Leader, 310 U. S. 469, 492-493. Despite the fact that the Act was therefore aimed at business combinations, not labor unions, and *701 that a careful reading of the legislative history shows that the interdiction of "every" contract, combination or conspiracy in restraint of trade was not intended to apply to labor unions and the activities of labor unions in their own interests, aimed at promotion of the labor conditions of their members,[2] the Court in Loewe v. Lawlor, 208 U. S. 274, held that the Act proscribed activities of labor unions and, in that case, prohibited the use of a secondary boycott as part of an organizational campaign. Congress responded by adopting in §§ 6 and 20 of the Clayton Act, 38 Stat. 731, 738, 15 U. S. C. § 17, 29 U. S. C. § 52 (1958 ed.), what has come to be known as the labor exemption from the Sherman Act. See Frankfurter & Greene, The Labor Injunction 139-144 (1930). Section 6 states: "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof. . . ."[3] Section *702 20 barred federal court injunctions "in any case between an employer and employees, or between employers and employees" involving a dispute over terms and conditions of employment. It specifically prohibited issuance of injunctions against certain activities such as quitting work, persuading others to do the same, etc., and concluded with the provision: "nor shall any of the acts specified . . . be considered or held to be violations of any law of the United States."
These congressional provisions, however, were frustrated, as thoughtful commentators have acknowledged, by decisions of this Court. See, e. g., Frankfurter & Greene, op. cit. supra, at 165-176; Cox, op. cit. supra, at 257-258. See also H. R. Rep. No. 669, 72d Cong., 1st Sess., 3, 7-8. In Duplex Co. v. Deering, 254 U. S. 443, the Court was again faced with a secondary boycott used as an organizational tool, that is, a post-Clayton Act Lawlor situation. Despite the Act, the Court again held the activity to violate the Sherman Act on the basis that § 6 did not confer immunity from antitrust liabilities "where . . . [unions] depart from . . . normal and legitimate objects . . . ." Id., at 469. What constitutes a "normal and legitimate" union object was to be determined by the courts; the Duplex Court held that a secondary boycott was not such an object. Section 20 was swept away on the ground that it only applied to controversies between "employers and employees," and that *703 "it would do violence to the . . . language employed" id., at 472, to hold that the section included an attempt to organize a new employer. Mr. Justice Brandeis, in dissent (joined by Mr. Justice Holmes and Mr. Justice Clarke), forcefully argued that the decision of the majority violated the clear congressional purpose to remove from judges the determination of "what public policy in regard to the industrial struggle demands," id., at 485, and to "declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest. . . ." Id., at 488.
Duplex was followed by other decisions of this Court and lower federal courts which sustained the application of the antitrust laws to curb both primary and secondary union activity. See, e. g., Bedford Co. v. Stone Cutters Assn., 274 U. S. 37; Coronado Coal Co. v. United Mine Workers, 268 U. S. 295; Alco-Zander Co. v. Amalgamated Clothing Workers, 35 F. 2d 203 (D. C. E. D. Pa.); United States v. Railway Employees' Dept., 283 F. 479 (D. C. N. D. Ill.).
Mr. Justice Brandeis' dissent in Duplex has, however, carried the day in the courts of history as evidenced by subsequent congressional action and decisions of this Court. The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101 (1958 ed.), was passed by Congress in 1932 expressly to overrule the majority opinion of Duplex and the cases that followed it and to affirm the philosophy of the dissenters in those cases. See United States v. Hutcheson, 312 U. S. 219, 235-236; Milk Wagon Drivers Union v. Lake Valley Farm Products, Inc., 311 U. S. 91, 102-103; New Negro Alliance v. Sanitary Grocery Co., 303 U. S. 552, 562.[4] Although framed in terms of restrictions *704 on the use of injunctions, this Court in United States v. Hutcheson, 312 U. S. 219, 235-236, recognized that the Act's "underlying aim . . . was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated . . . ." See H. R. Rep. No. 669, 72d Cong., 1st Sess., 6-8. As this Court has recognized, congressional enactment of the Norris-LaGuardia Act "was prompted by a desire . . . to withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer." Marine Cooks & Stewards v. Panama S. S. Co., 362 U. S. 365, 370, n. 7. The Wagner Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 et seq. (1958 ed.), followed the Norris-LaGuardia Act and gave affirmative protection and encouragement to union organization and collective bargaining and further reflected congressional desire to narrow the judiciary's role in the formulation of labor policy by entrusting principal enforcement responsibility to an administrative agency.
Following adoption of the Norris-LaGuardia and Wagner Acts, in Apex Hosiery Co. v. Leader, 310 U. S. 469, the Court gave proper recognition to congressional purpose in this area. In holding that union use of a sit-down strike as an organizational tool did not violate the antitrust laws, even though attended with violence, the Court stated:
"Strikes or agreements not to work, entered into by laborers to compel employers to yield to their demands, may restrict to some extent the power of employers who are parties to the dispute to compete in the market with those not subject to such demands. *705 But . . . the mere fact of such restrictions on competition does not in itself bring the parties to the agreement within the condemnation of the Sherman Act. . . . Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from nonunion made goods, . . . an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act."[5] 310 U. S., at 503-504.
Apex was followed by the Court in United States v. Hutcheson, supra, which has been recognized as a landmark case. Mr. Justice Frankfurter, after an extensive review of the history of the application of the antitrust laws to labor unions, concluded, for the Court, that "whether trade union conduct constitutes a violation *706 of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." 312 U. S., at 231. The Court then went on to hold: "So long as a union acts in its self interest and does not combine with non-labor groups,[6] the licit and the illicit . . . are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." 312 U. S., at 232.
In Allen Bradley Co. v. Union, 325 U. S. 797, the only relevant case in this area since Hutcheson, the Court reaffirmed the Hutcheson holding "that a union's exemption from the Sherman Act is not to be determined by a judicial `judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.' " 325 U. S., at 810-811. The Court, however, held that the Union was subject to Sherman Act liability on the facts of the case as there were "industry-wide understandings, looking not merely to terms and conditions of employment but also to price and market control. Agencies were set up composed of representatives of all three groups [the union-contractor-manufacturer combination] to boycott recalcitrant local contractors and manufacturers and to bar from the [New York City] area equipment manufactured outside its boundaries." *707 325 U. S., at 799-800. And "this combination of business men" "intended to and did restrain trade in and monopolize the supply of electrical equipment in the New York City area to the exclusion of equipment manufactured in and shipped from other states, and did also control its price and discriminate between its would-be customers." 325 U. S., at 800-801. Thus Allen Bradley involved two elements: (1) union participation in price fixing and market allocation, with the only union interest being the indirect prospect that these anti competitive devices might increase employers' profits which might then trickle down to the employees, (2) accomplished by the union's joining a combination or conspiracy of the employers.[7]
To round out this history it should be noted that, while rejecting attempts to restrict or eliminate the labor exemption from the antitrust laws,[8] Congress, in the 1947 Taft-Hartley Act, 61 Stat. 136, 29 U. S. C. § 141 et seq. (1958 ed.), and the 1959 Landrum-Griffin Act, 73 Stat. 519, 29 U. S. C. § 401 et seq. (1958 ed., Supp. V), has taken steps to proscribe union activities which, in its legislative judgment, it considers to be detrimental to the public good. Consistent, however, with its policy of not turning the lawfulness of union conduct on subjective judgments of purpose or effect, a policy expressed in §§ 6 and 20 of the Clayton Act and in the Norris-LaGuardia Act, Congress did this by making unlawful certain specific union activities under the National Labor *708 Relations Act, Congress, for example has curbed the secondary boycott in § 8 (b) (4) (B) of the National Labor Relations Act, preserving from condemnation certain secondary activities deemed legitimate.[9] The jurisdictional strike is regulated by § 8 (b) (4) (D) in conjunction with § 10 (k) of the Act.[10] Union opposition to automation has been regulated to the limited extent Congress wished to do so by § 8 (b) (6) of the Act.[11] Strikes and pressure by minority unions for organization or recognition are controlled by §§ 8 (b) (4) (C) and 8 (b) (7) of the Act.[12] Union restrictions on contracting out and subcontracting of work are delineated by § 8 (e) of the Act.[13] For the issue presently before us, it is most *709 significant that in enacting this last prohibition, Congress in the exercise of its legislative judgment, specifically excepted the unusual situations existing in the garment and building industries. Such exceptions for particular industries, which may be proper subjects of legislative discretion, would, of course, be most difficult for courts to make in employing a broad proscription like the Sherman Act.

III.
In my view, this history shows a consistent congressional purpose to limit severely judicial intervention in collective bargaining under cover of the wide umbrella of the antitrust laws, and, rather, to deal with what Congress deemed to be specific abuses on the part of labor unions by specific proscriptions in the labor statutes. I believe that the Court should respect this history of congressional purpose and should reaffirm the Court's holdings in Apex and Hutcheson which, unlike earlier decisions, gave effect to, rather than frustrated, the congressional design. The sound approach of Hutcheson is that the labor exemption from the antitrust laws derives from a synthesis of all pertinent congressional legislationthe nature of the Sherman Act itself,[14] §§ 6 and 20 of the Clayton Act, the Norris-LaGuardia Act, the Fair Labor Standards Act,[15] the Walsh-Healey[16] and Davis-Bacon[17] Acts, and the Wagner Act with its Taft-Hartley and Landrum-Griffin amendments. This last statute, in particular, provides *710 that both employers and unions must bargain over "wages, hours, and other terms and conditions of employment." 29 U. S. C. §§ 158 (a) (5), (b) (3), (d) (1958 ed.). Following the sound analysis of Hutcheson, the Court should hold that, in order to effectuate congressional intent, collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws.[18] This rule flows directly from the Hutcheson holding that a union acting as a union, in the interests of its members, and not acting to fix prices or allocate markets in aid of an employer conspiracy to accomplish these objects, with only indirect union benefits, is not subject to challenge under the antitrust laws. To hold that mandatory collective bargaining is completely protected would effectuate the congressional policies of encouraging free collective bargaining, subject only to specific restrictions contained in the labor laws, and of limiting judicial intervention in labor matters via the antitrust routean intervention which necessarily under the Sherman Act places on judges and juries the determination of "what public policy in regard to the industrial struggle demands." Duplex Co. v. Deering, supra, at 485 (dissenting opinion of Mr. Justice Brandeis). See Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L. J. 14 (1963).
Section 6 of the Clayton Act made it clear half a century ago that it is not national policy to force workers to compete in the "sale" of their labor as if it were a commodity or article of commerce. The policy was confirmed *711 and extended in the subsequent Norris-LaGuardia Act. Other federal legislation establishing minimum wages and maximum hours takes labor standards out of competition. The Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. §§ 201-219 (1958 ed.), clearly states that the existence of "labor conditions" insufficient for a "minimum standard of living . . . constitutes an unfair method of competition in commerce." 29 U. S. C. § 202 (a). Moreover, this Court has recognized that in the Walsh-Healey Act, 49 Stat. 2036, as amended, 41 U. S. C. §§ 35-45 (1958 ed.), Congress brought to bear the "leverage of the Government's immense purchasing power to raise labor standards" by eliminating substandard producers from eligibility for public contracts. Endicott Johnson Corp. v. Perkins, 317 U. S. 501, 507. See also Davis-Bacon Act, 46 Stat. 1494, 40 U. S. C. § 276a (1958 ed.). The National Labor Relations Act itself clearly expresses one of its purposes to be "the stabilization of competitive wage rates and working conditions within and between industries." 29 U. S. C. § 151. In short, business competition based on wage competition is not national policy and "the mere fact of such restrictions on competition does not . . . bring the parties . . . within the condemnation of the Sherman Act." Apex Hosiery Co. v. Leader, supra, at 503.
The National Labor Relations Act also declares it to be the policy of the United States to promote the establishment of wages, hours, and other terms and conditions of employment by free collective bargaining between employers and unions. The Act further provides that both employers and unions must bargain about such mandatory subjects of bargaining. This national scheme would be virtually destroyed by the imposition of Sherman Act criminal and civil penalties upon employers and unions engaged in such collective bargaining. To tell the parties *712 that they must bargain about a point but may be subject to antitrust penalties if they reach an agreement is to stultify the congressional scheme.
Moreover, mandatory subjects of bargaining are issues as to which union strikes may not be enjoined by either federal or state courts.[19] To say that the union can strike over such issues but that both it and the employer are subject to possible antitrust penalties for making collective bargaining agreements concerning them is to assert that Congress intended to permit the parties to collective bargaining to wage industrial warfare but to prohibit them from peacefully settling their disputes. This would not only be irrational but would fly in the face of the clear congressional intent of promoting "the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation." Fibreboard Paper Prods. Corp. v. Labor Board, 379 U. S. 203, 211.
Congress has also recognized that some labor organizations seek, as in Pennington, through industry-wide bargaining, to eliminate differences in labor standards among employers. This was common knowledge in 1935 when the Wagner Act was enacted. The aims and practices of unions engaging in industry-wide bargaining were well known in 1947 at the time of the Taft-Hartley revision. Then and on subsequent occasions Congress refused *713 to enact bills to restrict or prohibit industry-wide bargaining. See, e. g., H. R. 3020, 80th Cong., 1st Sess., §§ 2 (16), 9 (f) (1), 12 (a) (3) (A), 12 (a) (4), H. R. Rep. No. 245, 80th Cong., 1st Sess., 24, 73; note 8, supra, and citations contained therein; H. R. 8449, 82d Cong., 2d Sess. Nor can it be seriously argued that multi-employer bargaining, as in Jewel Tea, introduces an illegal element or is otherwise opposed to the national labor policy. Indeed, this Court, to implement congressional policy sanctioning multi-employer bargaining, permitted employers to resort, under certain circumstances, to lockouts to protect the integrity of the multi-employer bargaining unit. See Labor Board v. Truck Drivers Union, No. 449, 353 U. S. 87; Labor Board v. Brown, 380 U. S. 278.[20] The wisdom of permitting industry-wide and multi-employer bargaining is for Congress to decide, unless this Court is to return to the discredited approach of the majority in Duplex and substitute its notion for that of Congress as to how unions and employers should conduct their collective bargaining.

IV.
The Court in Pennington today ignores this history of the discredited judicial attempt to apply the antitrust laws to legitimate collective bargaining activity, and it *714 flouts the clearly expressed congressional intent that, since "[t]he labor of a human being is not a commodity or article of commerce,"[21] the antitrust laws do not proscribe, and the national labor policy affirmatively promotes, the "elimination of price competition based on differences in labor standards." Apex Hosiery Co. v. Leader, supra, at 503. While purporting to recognize the indisputable fact that the elimination of employer competition based on substandard labor conditions is a proper labor union objective endorsed by our national labor policy and that, therefore, "a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers." Pennington, ante, at 665, the Court holds that "a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." Ibid.
This rule seems to me clearly contrary to the congressional purpose manifested by the labor statutes, and it will severely restrict free collective bargaining. Since collective bargaining inevitably involves and requires discussion of the impact of the wage agreement reached with a particular employer or group of employers upon competing employers, the effect of the Court's decision will be to bar a basic element of collective bargaining from the conference room. If a union and employer are prevented from discussing and agreeing upon issues which are, in the great majority of cases, at the central core of bargaining, unilateral force will inevitably be substituted for rational discussion and agreement. Plainly and simply, the Court would subject both unions and employers to antitrust sanctions, criminal as well as civil, if in collective bargaining they concluded a wage agreement and, as part of the agreement, the union has undertaken to use its best efforts *715 to have this wage accepted by other employers in the industry. Indeed, the decision today even goes beyond this. Under settled antitrust principles which are accepted by the Court as appropriate and applicable, which were the basis for jury instructions in Pennington, and which will govern it upon remand, there need not be direct evidence of an express agreement. Rather the existence of such an agreement, express or implied, may be inferred from the conduct of the parties. See, e. g., Interstate Circuit, Inc. v. United States, 306 U. S. 208; American Tobacco Co. v. United States, 328 U. S. 781; United States v. Paramount Pictures, Inc., 334 U. S. 131; Theater Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U. S. 537. Or, as my Brother DOUGLAS, concurring in Pennington, would have it, conduct of the parties could be prima facie evidence of an illegal agreement. Ante, at 673. As the facts of Pennington illustrate, the jury is therefore at liberty to infer such an agreement from "clear" evidence that a union's philosophy that high wages and mechanization are desirable has been accepted by a group of employers and that the union has attempted to achieve like acceptance from other employers. For, as I have pointed out, stripped of all adjectives, this is what Pennington presents. Yet the Court today holds "the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws." Ante, at 669.
The rational thing for an employer to do, when faced with union demands he thinks he cannot meet, is to explain why, in economic terms, he believes that he cannot agree to the union requests. Indeed, the Labor Act's compulsion to bargain in good faith requires that he meaningfully address himself to the union's requests. See Labor Board v. Truitt Mfg. Co., 351 U. S. 149. A recurring and most understandable reason given by employers for their resistance to union demands is that competitive *716 factors prevent them from accepting the union's proposed terms. Under the Court's holding today, however, such a statement by an employer may start both the employer and union on the road to antitrust sanctions, criminal and civil. For a jury may well interpret such discussion and subsequent union action as showing an implicit or secret agreement to impose uniform standards on other employers. Nor does the Court's requirement that there be "direct or indirect evidence of the conspiracy," ante, at 665, n. 2whatever those undefined terms in the opinion may meanprovide any substantial safeguard for uninhibited collective bargaining discussions. In Pennington itself, the trial court instructed the jury that a union's unilateral actions did not subject it to antitrust sanctions, and yet the jury readily inferred a "conspiracy" from the "direct or indirect evidence" of the union's publicly stated policy in favor of high wages and mechanization, its collective bargaining agreement with a group of employers establishing high wages, and its attempts to obtain similar high wages from other employers.
Furthermore, in order to determine whether, under the Court's standard, a union is acting unilaterally or pursuant to an agreement with employers, judges and juries will inevitably be drawn to try to determine the purpose and motive of union and employer collective bargaining activities. The history I have set out, however, makes clear that Congress intended to foreclose judges and juries from roaming at large in the area of collective bargaining, under cover of the antitrust laws, by inquiry into the purpose and motive of the employer and union bargaining on mandatory subjects. Such roaming at large, experience shows, leads to a substitution of judicial for congressional judgment as to how collective bargaining should operate.
The case of Alco-Zander Co. v. Amalgamated Clothing Workers, 35 F. 2d 203 (D. C. E. D. Pa.), is one example of *717 judicial inadequacy in this sensitive economic area. That case involved a situation where the unionized garment industry in New York was being undersold by the lower priced, nonunion garment industry of Philadelphia. The union, fearing for the future of the jobs of its members employed in the unionized New York industry, started an organizing drive in Philadelphia. A federal district court enjoined, as a violation of the antitrust laws, the union's organizational campaign which consisted of primary strikes and peaceful picketing. The court declared that "the primary purpose of the campaign for the unionization of the Philadelphia market was the protection of the unionized markets in other states," and that "the object of the strikes was to put an end to all production in Philadelphia under nonunion conditions and only to permit it to be resumed if and when the manufacturers were willing to operate upon an union basis and under union wage scales." 35 F. 2d, at 205. It is clear, therefore, that the court enjoined the union's activities as antitrust violations because it believed that this purpose and object was socially and economically undesirable. Alco-Zander and other similar cases[22] were almost universally condemned as striking examples of judicial interference in legitimate collective bargaining via the antitrust laws because of judge-made notions as to the economic wisdom of the union conduct. See, e. g., Berman, Labor and the Sherman Act 248-259 (1930); Comment, 24 Ill. L. Rev. 925 (1930). There is no doubt that the Norris-LaGuardia *718 Act was designed to overrule them. See H. R. Rep. No. 669, 72d Cong., 1st Sess., 3-7; S. Rep. No. 163, 72d Cong., 1st Sess., 9-10.
Congress in the Norris-LaGuardia Act and other labor statutes, as this Court recognized in Apex and Hutcheson determined that judicial notions of the social and economic desirability of union action should not govern antitrust liability in the area of collective bargaining. The fact that a purpose-motive approach necessarily opens the door to basing criminal or civil penalties under the Sherman Act on just such a determination and to making courts the arbiters of our national labor policy is borne out not only by the history of cases like Alco-Zander but also by the cases decided today.
In Pennington, central to the alleged conspiracy is the claim that hourly wage rates and fringe benefits were set at a level designed to eliminate the competition of the smaller nonunion companies by making the labor cost too high for them to pay. Indeed, the trial judge charged that there was no violation of the Sherman Act in the establishing of wages and welfare payments through the national contract, "provided" the mine workers and the major coal producers had not agreed to fix "high" rates "in order to drive the small coal operators out of business." Under such an instruction, if the jury found the wage scale too "high" it could impute to the union the unlawful purpose of putting the nonunion operators out of business. It is clear that the effect of the instruction therefore, was to invite 12 jurymen to become arbiters of the economic desirability of the wage scale in the Nation's coal industry. The Court would sustain the judgment based on this charge and thereby put its stamp of approval on this role for courts and juries.
The Court's approval of judges and juries determining the permissible wage scale for working men in an industry is confirmed by the Court's express statement "there are *719 limits to what a union or an employer may offer or extract in the name of wages," Pennington, ante, at 665. To allow a jury to infer an illegal "conspiracy" from the agreed-upon wage scale means that the jury must determine at what level the wages could be fixed without impelling the parties into the ambit of the antitrust laws. Is this not another way of saying that, via the antitrust route, a judge or jury may determine, according to its own notions of what is economically sound, the amount of wages that a union can properly ask for or that an employer can pay? It is clear, as experience shows, that judges and juries neither have the aptitude nor possess the criteria for making this kind of judgment. In Pennington, absent the alleged conspiracy, would the wage rate and fringe benefits have been lower? Should they have been lower? If Pennington were an action for injunctive relief, what would be the appropriate remedy to reach the labor cost which is at the heart of the alleged antitrust violation? A judicial determination of the wage rate? A judicial nullification of the existing rate with a direction to negotiate a lower one? I cannot believe that Congress has sanctioned judicial wage control under the umbrella of the Sherman Act, for, absent a national emergency,[23] Congress has never legislated wage control in our free-enterprise economy.
The history I have set out makes clear that Congress intended to foreclose judges and juries from making essentially economic judgments in antitrust actions by determining whether unions or employers had good or bad motives for their agreements on subjects of mandatory bargaining. Moreover, an attempted inquiry into the motives of employers or unions for entering into collective bargaining agreements on subjects of mandatory bargaining *720 is totally artificial. It is precisely in this area of wages, hours, and other working conditions that Congress has recognized that unions have a substantial, direct, and basic interest of their own to advance.
As I have discussed, the Court's test is not essentially different from the discredited purpose-motive approach. Only rarely will there be direct evidence of an express agreement between a union and an employer to impose a particular wage scale on other employers. In most cases, as was true of Pennington, the trial court will instruct the jury that such an illegal agreement may be inferred from the conduct"indirect evidence"of the union and employers. To allow a court or a jury to infer an illegal agreement from collective bargaining conduct inevitably requires courts and juries to analyze the terms of collective bargaining agreements and the purposes and motives of unions and employers in agreeing upon them. Moreover, the evidence most often available to sustain antitrust liability under the Court's theory would show, as it did in Pennington, simply that the motives of the union and employer coincidethe union seeking high wages and protection from low-wage, nonunion competition, and the employer who pays high wages seeking protection from competitors who pay lower wages. When there is this coincidence of motive, does the illegality of the "conspiracy" turn on whether the Union pursued its goal of a uniform wage policy through strikes and not negotiation? As I read the Court's opinion this is precisely what the result turns on and thus unions are forced, in order to show that they have not illegally "agreed" with employers, to pursue their aims through strikes and not negotiations. Yet, it is clear that such a result was precisely what the National Labor Relations Act was designed to prevent. The only alternative to resolution of collective bargaining issues by force available to the parties under the Court's holding is the encouragement of fraud and deceit. An employer will be forced to take a *721 public stand against a union's wage demands, even if he is willing to accept them, lest a too ready acceptance be used by a jury to infer an agreement between the union and employer that the same wages will be sought from other employers. Yet, I have always thought that in collective bargaining, even more than in other areas of contractual agreement, the objective is open covenants openly arrived at.
Furthermore, I do not understand how an inquiry can be formulated in terms of whether the union action is unilateral or is a consequence of a "conspiracy" with employers independently of the economic terms of the collective bargaining agreement. The agreement must be admitted into evidence and the Court holds that its economic consequences are relevant. In the end, one way or another, the entire panoply of economic fact becomes involved, and judges and juries under the Court's view would then be allowed to speculate about why a union bargained for increased compensation, or any other labor standard within the scope of mandatory bargaining. It is precisely this type of speculation that Congress has rejected.
The plain fact is that it makes no sense to turn antitrust liability of employers and unions concerning subjects of mandatory bargaining on whether the union acted "unilaterally" or in "agreement" with employers. A union can never achieve substantial benefits for its members through unilateral action; I should have thought that the unsuccessful history of the Industrial Workers of the World, which eschewed collective bargaining and espoused a philosophy of winning benefits by unilateral action, proved this beyond question. See Dulles, Labor in America 208-223 (1949); Chaplin, Wobbly (1948). Furthermore, I cannot believe that Congress, by adopting the antitrust laws, put its stamp of approval on this discredited IWW philosophy of industrial relations; rather, in the Clayton Act and the labor statutes, Congress has *722 repudiated such a philosophy. Our national labor policy is designed to encourage the peaceful settlement of industrial disputes through the negotiation of agreements between employers and unions. Unions cannot, as the history of the IWW shows, successfully retain employee benefits by unilateral action; nor can employers be assured of continuous operation without contractual safeguards. The history of labor relations in this country shows, as Congress has recognized, that progress and stability for both employers and employees can be achieved only through collective bargaining agreements involving mutual rights and responsibilities.
This history also shows that labor contracts establishing more or less standardized wages, hours, and other terms and conditions of employment in a given industry or market area are often secured either through bargaining with multi-employer associations or through bargaining with market leaders that sets a "pattern" for agreements on labor standards with other employers. These are two similar systems used to achieve the identical result of fostering labor peace through the negotiation of uniform labor standards in an industry. Yet the Court makes antitrust liability for both unions and employers turn on which of these two systems is used. It states that uniform wage agreements may be made with multi-employer units but an agreement cannot be made to affect employers outside the formal bargaining unit. I do not believe that the Court understands the effect of its ruling in terms of the practical realities of the automobile, steel, rubber, shipbuilding, and numerous other industries which follow the policy of pattern collective bargaining. See Chamberlain, Collective Bargaining 259-263 (1951); note 20, supra. I also do not understand why antitrust liability should turn on the form of unit determination rather than the substance of the collective bargaining impact on the industry.
*723 Finally, it seems clear that the essential error at the core of the Court's reasoning is that it ignores the express command of Congress that "[t]he labor of a human being is not a commodity or article of commerce,"[24] and therefore that the antitrust laws do not prohibit the "elimination of price competition based on differences in labor standards." Apex Hosiery Co. v. Leader, supra, at 503. This is made clear by a simple question that the Court does not face. Where there is an "agreement" to seek uniform wages in an industry, in what item is competition restrained? The answer to this question can only be that competition is restrained in employee wage standards. That is, the union has agreed to restrain the free competitive market for labor by refusing to provide labor to other employers below the uniform rate. Under such an analysis, it would seem to follow that the existence of a union itself constitutes a restraint of trade, for the object of a union is to band together the individual workers in an effort, by common action, to obtain better wages and working conditionsi. e., to obtain a higher price for their labor. The very purpose and effect of a labor union is to limit the power of an employer to use competition among workingmen to drive down wage rates and enforce substandard conditions of employment. If competition between workingmen to see who will work for the lowest wage is the ideal, all labor unions should be eliminated. Indeed the Court itself apparently realizes that its holding that the antitrust laws are violated when a labor union agrees with employers not to compete on wages is premised on the belief that labor is a commodity and that this premise leads to the logical conclusion that unions themselves restrain trade in this commodity. This is the only reason I can imagine for the Court's felt need, in 1965, to assert that "[t]he antitrust laws do not *724 bar the existence and operation of labor unions as such." Pennington, ante, at 661. (Emphasis added.)
As I have already discussed, however, if one thing is clear, it is that Congress has repudiated the view that labor is a commodity and thus there should be competition to see who can supply it at the cheapest price. See pp. 710-713, supra. The kind of competition which is suppressed by employer-union agreement on uniform wages can only be competition between unions to see which union will agree to supply labor at a lower rate, or competition between employers in the sale of their products based on differences in labor costs. Neither type of "suppression," I submit, can be supported as a restraint of trade condemned by the antitrust laws. No one, I think, believes that Congress intended that there be an economic system under which unions would compete with each other to supply labor at the lowest possible cost. It is equally clear that Congress did not intend that competition among manufacturers should be carried on, not on the basis of their relative efficiency or ability to produce what the consumer demands, but on their ability to operate at substandard wage rates. One of the important social advantages of competition mandated by the antitrust laws is that it rewards the most efficient producer and thus ensures the optimum use of our economic resources. This result, as Congress recognized, is not achieved by creating a situation in which manufacturers compete on the basis of who pays the lowest wages. As this Court stated in Apex Hosiery Co. v. Leader, supra, at 503-504, the "elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act."
The assumption running through the Court's opinion in Pennington, as well as the opinion of my Brother DOUGLAS, is that giving full scope to the congressional *725 exemption of labor unions from the antitrust laws will operate to the advantage of large employers and big unions to the prejudice of small employers. Although I cannot see how that should affect the result reached on the basis of congressional intent even if the assumption were true, see Hunt v. Crumboch, 325 U. S. 821, 825, n. 1, I feel compelled to note that this assumption is not accurate and is belied by the actualities of industrial relations. Experience in this area shows that frequently unions first organize the small and weak employers. These small employers are understandably afraid that unless other, larger employers are also organized, effective competition will be impossible. They will thus often seek to have the union attempt to organize and bargain for similar labor standards with their larger competitors so that the requirement to pay high union wages will not force the small businessmen to close down their enterprises.
The Court's holding in Pennington today flies in the face of Apex and Hutcheson and restrains collective bargaining in the same way as did the holding of the majority in Duplexa holding which Congress has expressly repudiated in favor of Mr. Justice Brandeis' dissenting views. It represents contemporary manifestations of the reluctance of judges to give full effect to congressional purpose in this area and the substitution of judges' views for those of Congress as to how free collective bargaining should operate.[25]

*726 V.
The judicial expressions in Jewel Tea represent another example of the reluctance of judges to give full effect to congressional purpose in this area and the substitution by judges of their views for those of Congress as to how free collective bargaining should operate. In this case the Court of Appeals would have held the Union subject to the Sherman Act's criminal and civil penalties because in the court's social and economic judgment, the determination of the hours at which meat is to be sold is a "proprietary" matter within the exclusive control of management and thus the Union had no legitimate interest in bargaining over it. My Brother DOUGLAS, joined by MR. JUSTICE BLACK and MR. JUSTICE CLARK, would affirm this judgment apparently because the agreement was reached through a multi-employer bargaining unit. But, as I have demonstrated above, there is nothing even remotely illegal about such bargaining. Even if an independent conspiracy test were applicable to the Jewel Tea situation, the simple fact is that multi-employer bargaining conducted at arm's length does not constitute union abetment of a business combination. It is often a self-defensive form of employer bargaining designed to match union strength. See Labor Board v. Truck Drivers Union, supra; Labor Board v. Brown, supra.
*727 My Brother WHITE, joined by THE CHIEF JUSTICE and MR. JUSTICE BRENNAN, while not agreeing with my Brother DOUGLAS, would reverse the Court of Appeals. He also, however, refuses to give full effect to the congressional intent that judges should not, under cover of the Sherman Act umbrella, substitute their economic and social policies for free collective bargaining. My Brother WHITE recognizes that the issue of the hours of sale of meat concerns a mandatory subject of bargaining based on the trial court's findings that it directly affected the hours of work of the butchers in the self-service markets, and therefore, since there was a finding that the Union was not abetting an independent employer conspiracy, he joins in reversing the Court of Appeals. In doing so, however, he apparently draws lines among mandatory subjects of bargaining, presumably based on a judicial determination of their importance to the worker, and states that not all agreements resulting from collective bargaining based on mandatory subjects of bargaining are immune from the antitrust laws, even absent evidence of union abetment of an independent conspiracy of employers. Following this reasoning, my Brother WHITE indicates that he would sustain a judgment here, even absent evidence of union abetment of an independent conspiracy of employers, if the trial court had found "that self-service markets could actually operate without butchers, at least for a few hours after 6 p. m., that no encroachment on butchers' work would result and that the work load of butchers during normal working hours would not be substantially increased. . . ." Ante, at 692. Such a view seems to me to be unsupportable. It represents a narrow, confining view of what labor unions have a legitimate interest in preserving and thus bargaining about. Even if the self-service markets could operate after 6 p. m., without their butchers and without increasing the work of their butchers *728 at other times, the result of such operation can reasonably be expected to be either that the small, independent service markets would have to remain open in order to compete, thus requiring their union butchers to work at night, or that the small, independent service markets would not be able to operate at night and thus would be put at a competitive disadvantage.[26] Since it is clear that the large, automated self-service markets employ fewer butchers per volume of sales than service markets do, the Union certainly has a legitimate interest in keeping service markets competitive so as to preserve jobs. Job security of this kind has been recognized to be a legitimate subject of union interest. See Telegraphers v. Chicago & N. W. R. Co., 362 U. S. 330; Teamsters Union v. Oliver, 358 U. S. 283, 362 U. S. 605; United States v. Hod Carriers, 313 U. S. 539, affirming United States v. Carrozzo, 37 F. Supp. 191 (D. C. N. D. Ill.); United States v. American Federation of Musicians, 318 U. S. 741, affirming 47 F. Supp. 304 (D. C. N. D. Ill.); Window Glass Mfrs. v. United States, 263 U. S. 403; cf. Teamsters Union v. Hanke, 339 U. S. 470, 475 (opinion of Mr. Justice Frankfurter); see also California Sportswear & Dress Assn., Inc., 54 F. T. C. 835. As I have previously stated: "To believe that labor union interests may not properly extend beyond mere direct job and wage competition is to ignore not only economic and social realities so obvious as not to need mention, but also the graphic lessons of American labor union history." Los Angeles Meat & Provision Drivers Union v. United States, 371 U. S. 94, 103, 104 (concurring opinion). The direct interest of the union in not working undesirable hours by curtailing all business at those hours is, of course, a far cry from the indirect "interest" in Allen *729 Bradley in fixing prices and allocating markets solely to increase the profits of favored employers.
Indeed, if the Union in Jewel Tea were attempting to aid the small service butcher shops and thus save total employment against automation, perhaps at a necessarily reduced wage scale, the case would present the exact opposite union philosophy from that of the Mine Workers in Pennington. Putting the opinion of the Court in Pennington together with the opinions of my Brothers DOUGLAS and WHITE in Jewel Tea, it would seem that unions are damned if their collective bargaining philosophy involves acceptance of automation (Pennington) and are equally damned if their collective bargaining philosophy involves resistance to automation (Jewel Tea). Again, the wisdom of a union adopting either philosophy is not for judicial determination. This Court recently stated that "we emphatically refuse to go back to the time when courts used the Due Process Clause `to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' " Ferguson v. Skrupa, 372 U. S. 726, 731-732. I likewise see no reason why this Court should go back to the time when judges determined "according to their own economic and social views whether the damage inflicted on an employer in an industrial struggle was damnum absque injuria, because an incident of trade competition, or a legal injury, because in their opinion, economically and socially objectionable." Duplex Co. v. Deering, supra, at 486 (dissenting opinion of Mr. Justice Brandeis).

VI.
Moreover, while these cases involve suits against unions, we should not overlook the fact that if unions are held liable under the antitrust laws for collective bargaining activities concerning mandatory subjects, then *730 the employer parties to this mandatory collective bargaining would also be subject to antitrust penalties, criminal and civil. It would seem the height of unfairness so to penalize employers for the discharge of their statutory duty to bargain on wages, hours, and other terms and conditions of employment, which duty, this Court has held, requires the employer to enter into a signed contract with the union embodying the collective bargaining terms agreed upon. See H. J. Heinz Co. v. Labor Board, 311 U. S. 514. The unfairness to employers of this situation is aptly illustrated by the record facts of Pennington. From 1930 until the formation of the Bituminous Coal Operators' Association and the negotiation of a uniform wage agreement between the Association and the union in 1950, bargaining in the coal industry was highlighted by bitter and protracted negotiations. Costly strikes were a recurring phenomenon and government seizure of the mines was characteristic of most of the period. Unfair labor practice charges were often exchanged and lawsuits resulting from bargaining differences were on court dockets continuously. In 1934, 400,000 miners struck for one week. In 1939, a five-week strike ended only after presidential intervention. In 1941, the union struck southern mines after those operators withdrew from negotiations in which the union was seeking to eliminate a regional wage differential. Shortly thereafter the union struck the so-called "captive" mines (mines which produce coal to be used in the processing of other products, mainly steel). One hundred thousand other miners struck in sympathy with the captive mine employees. During negotiations in 1943, there were a number of strikes over a six-month period and the Government twice seized the struck mines. Similarly in 1945 a number of strikes following a breakdown in negotiations resulted in government seizure of 235 mines. When the Government seized the mines once again in 1946 because *731 of a breakdown in negotiations over a welfare fund, a settlement was reached only through the active intervention of the Secretary of the Interior, who himself negotiated the beginning of the program of welfare fund benefits.
It was the opinion of many employers and neutral observers of the scene that these chaotic collective bargaining conditions were a result, at least in part, of the disorganized bargaining on the employer side. With each new effort at negotiations the operators had attempted to form a committee with various subcommittees to receive and present bargaining proposals. There was, however, no permanent organization to unify the operators' bargaining position and thereby to attempt to maintain peaceful and stable labor relations. The amorphous and ad hoc nature of the employers' bargaining organization was felt to have subjected the operators to whipsawing by the union and thus impaired serious, good faith and business-like bargaining. It was to try to correct this situation that the Association was formed. The Association is open to any coal operator who wishes to participate in the negotiations through it. Since this change in 1950, collective bargaining has been, to a marked degree, stabilized in the industry. There have been no governmental seizures or nation-wide strikes. Collective bargaining problems have not ended as a matter of course in Labor Board or court proceedings, or in governmental seizure or other intervention. While the negotiations have not always been easy and many difficult issues have arisen, the procedure for solving them has gone from the earlier jungle-type economic warfare to the reasoned and rational process of the conference table. I cannot believe that Congress, which has manifested a clear general purpose of promoting labor peace and stability, and, in particular, has a long history of attention to collective bargaining *732 in coal,[27] one of our basic industries, intended that, these employer efforts to perfect a solid front in bargaining with the miners' union should have the effect of subjecting the employers, as well as the union, to the penalties of the antitrust laws. To apply the antitrust laws at this late date to such activities would endanger the stability which now characterizes collective bargaining in the coal industry and other basic industries with similar collective bargaining histories. It is in recognition of this fact that Congress has on a number of occasions refused to enact legislation that would curtail industry-wide bargaining[28] or would make the antitrust laws generally applicable to collective bargaining activity.[29]

VII.
My view that Congress intended that collective bargaining activity on mandatory subjects of bargaining under the Labor Act not be subject to the antitrust laws does not mean that I believe that Congress intended that activity involving all non mandatory subjects of bargaining be similarly exempt. The direct and overriding interest of unions in such subjects as wages, hours, and other working conditions, which Congress has recognized in making them subjects of mandatory bargaining, is clearly *733 lacking where the subject of the agreement is price-fixing and market allocation. Moreover, such activities are at the core of the type of anti competitive commercial restraint at which the antitrust laws are directed.
Nor does my view mean that where a union operates as a businessman, exercising a proprietary or ownership function, it is beyond the reach of the antitrust laws merely because it is a union. On the contrary, the labor exemption is inapplicable where the union acts not as a union but as an entrepreneur. See, e. g., Streiffer v. Seafarers Sea Chest Corp., 162 F. Supp. 602 (D. C. E. D. La.); United States v. Seafarers Sea Chest Corp., 1956 CCH Trade Cases ¶ 68,298 (D. C. E. D. N. Y.). Therefore, if a union is found by sufficient evidence and under proper instructions to have participated as a proprietor in actions violative of the antitrust laws, it is no more shielded from antitrust sanctions than any other business participant.
In Pennington, there were allegations that a part of the conspiracy of the large coal operators consisted of collusive bidding on the TVA spot market of West Kentucky Coal Company, Nashville Coal Company, and two other coal operators, for which the Union allegedly shared responsibility. It was asserted that the effect of this alleged collusive bidding was to drive down the prices on the spot market and thereby injure the small coal operators. Although the Court of Appeals apparently accepted this position, it did not deal directly with the question of whether the evidence was sufficient to show the Union's participation in the alleged scheme. Rather, the Court of Appeals relied upon the fact that the Union was a major stockholder in West Kentucky and had substantial interests in Nashville. It examined the origin and growth of the union interest in these two companies and concluded: "It was not unreasonable for the jury to conclude from these facts that it was the purpose of the UMW to have a very material voice, if not the dominant *734 one, in determining the policies and operations of these two major coal companies, which, as is hereinafter pointed out are charged with playing an important role in the alleged conspiracy." 325 F. 2d 804, 814. This, it appears, is as near as the Court of Appeals came to passing upon the sufficiency of the evidence connecting the Union with the alleged collusive spot market bidding and in effect is a holding that the ownership of a controlling or substantial interest in a company which violates the antitrust laws subjects the owner of that interest to personal antitrust liability. In my view, this is clearly not the law. The ownership of a controlling or substantial interest in a company which conspires with others in violation of the antitrust laws does not in itself impose antitrust liability on the owner. Hartford-Empire Co. v. United States, 323 U. S. 386, 403; Buckeye Powder Co. v. E. I. du Pont de Nemours P. Co., 223 F. 881, 885-886 (C. A. 3d Cir.), aff'd on other grounds, 248 U. S. 55; Union Pacific Coal Co. v. United States, 173 F. 737 (C. A. 8th Cir.). Rather the owner must be shown to have participated knowingly and actively in the alleged illegal activity. See United States v. Wise, 370 U. S. 405, 416. Cf. Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 299-305; United Mine Workers v. Coronado Co., 259 U. S. 344, 393-396.
Moreover, the trial court erred in its instruction to the jury on this issue. It correctly instructed the jury that union ownership of a coal company did not violate the law. However, it erroneously refused to instruct the jury that the Union's financial stake in the two coal companies did not of itself show participation in an illegal conspiracy, if there was one, and that the Union must have been shown to have participated through being party to an overall plan which included the spot-market bidding or through its participation in the particular practices complained *735 of. Thus it is clear that the judgment against the Union cannot stand on the basis of this part of the case.
Finally, my conclusion that unions and employers are exempt from the operations of the antitrust laws for activities involving subjects of mandatory bargaining is based solely on congressional statutes which I believe clearly grant such an exemption and not on any views past or present as to the economic desirability of such an exemption. Whether it is wise or sound public policy for this exemption to continue to exist in its present form, or at all, or whether the exemption gives too much power to labor organizations, is solely for Congress to determine. The problem of the application of the antitrust laws to collective bargaining is but another aspect of the question of whether it is sound public policy to recognize or to limit the "right of industrial combatants to push their struggle to the limits of the justification of self-interest." Duplex Co. v. Deering, supra, at 488 (dissenting opinion of Mr. Justice Brandeis).
On this issue I am in agreement with the Court in Hunt v. Crumboch, supra, at 825, n. 1: "That which Congress has recognized as lawful, this Court has no constitutional power to declare unlawful, by arguing that Congress has accorded too much power to labor organizations."
For the reasons expressed above, I dissent from the opinion of the Court but concur in the reversal of the Court of Appeals in Pennington, and concur in the judgment of the Court in Jewel Tea.
MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE CLARK concur, dissenting.
If we followed Allen Bradley Co. v. Union, 325 U. S. 797,[*] we would hold with the Court of Appeals that this *736 multi-employer agreement with the union not to sell meat between 6 p. m. and 9 a. m. was not immunized from the antitrust laws and that respondent's evidence made out a prima facie case that it was in fact a violation of the Sherman Act.
If, in the present case, the employers alone agreed not to sell meat from 6 p. m. to 9 a. m., they would be guilty of an anticompetitive practice, barred by the antitrust laws. Absent an agreement or conspiracy, a proprietor can keep his establishment open for such hours as he chooses. Cf. Textile Workers v. Darlington Mfg. Co., 380 U. S. 263. My Brother WHITE recognizes, as he must, that the agreement in this case has an "effect on competition [that] is apparent and real" and that it is an "obvious restraint on the product market," ante, pp. 691 and 692. That Jewel has been coerced by the unions into respecting this agreement means that Jewel cannot use convenience of shopping hours as a means of competition. As the Court of Appeals pointed out, 331 F. 2d, at 550, there is nothing procompetitive about this agreement. Cf. Chicago Board of Trade v. United States, 246 U. S. 231.
At the conclusion of respondent's case, the District Court dismissed Associated and Bromann from the action, which was tried without a jury, on the ground that there was no evidence of a conspiracy between Associated and the unions. But in the circumstances of this case the collective bargaining agreement itself, of which the District Court said there was clear proof, was evidence of a conspiracy among the employers with the unions to impose the marketing-hours restriction on Jewel via a strike threat by the unions. This tended to take from the merchants who agreed among themselves their freedom to *737 work their own hours and to subject all who, like Jewel wanted to sell meat after 6 p. m. to the coercion of threatened strikes, all of which if done in concert only by businessmen would violate the antitrust laws. See Fashion Guild v. Federal Trade Comm'n, 312 U. S. 457, 465.
In saying that there was no conspiracy, the District Court failed to give any weight to the collective bargaining agreement itself as evidence of a conspiracy and to the context in which it was written. This Court makes the same mistake. We said in Allen Bradley Co. v. Union, supra, at 808, ". . . we think Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." Here the contract of the unions with a large number of employers shows it was planned and designed not merely to control but entirely to prohibit "the marketing of goods and services" from 6 p. m. until 9 a. m. the next day. Some merchants relied chiefly on price competition to draw trade; others employed courtesy, quick service, and keeping their doors open long hours to meet the convenience of customers. The unions here induced a large group of merchants to use their collective strength to hurt others who wanted the competitive advantage of selling meat after 6 p. m. Unless Allen Bradley is either overruled or greatly impaired, the unions can no more aid a group of businessmen to force their competitors to follow uniform store marketing hours than to force them to sell at fixed prices. Both practices take away the freedom of traders to carry on their business in their own competitive fashion.
My Brother WHITE's conclusion that the concern of the union members over marketing hours is "immediate and direct" depends upon there being a necessary connection between marketing hours and working hours. That connection is found in the District Court's finding that *738 "in stores where meat is sold at night it is impractical to operate without either butchers or other employees." 215 F. Supp. 839, 846. It is, however, undisputed that on some nights Jewel does so operate in some of its stores in Indiana, and even in Chicago it sometimes operates without butchers at night in the sale of fresh poultry and sausage, which are exempt from the union ban.
It is said that even if night self-service could be carried on without butchers, still the union interest in store hours would be immediate and direct because competitors would have to stay open too or be put at a disadvantageand some of these competitors would be non-self-service stores that would have to employ union butchers at night. But Allen Bradley forecloses such an expansive view of the labor exemption to the antitrust laws.
NOTES
[1] The practice in the Chicago area is for the employers and the butchers to execute separate, but similar, collective bargaining agreements for self-service and service markets. A self-service market is "one in which fresh beef, veal, lamb, mutton or port are available for sale on a prepackage self-service basis." Semi-self-service markets, those in which fresh meat is made available on a prepackaged basis but there is also a service counter offering custom cutting for those who prefer it, are governed by the self-service contract. Service markets are those in which no fresh meat is made available on a self-service basis.
[2] Action upon the separate petition of Associated and Bromann, No. 321 Oct. Term, 1964, has been withheld, pending disposition of this case.
[3] The grant of certiorari was limited to the following questions:

"1. Based on the District Court's undisturbed finding that the limitation `was imposed after arm's length bargaining, . . . and was fashioned exclusively by the unions to serve their own interests how long and what hours members shall work, what work they shall do, and what pay they shall receive,' whether the limitation upon market operating hours and the controversy concerning it are within the labor exemption of the Sherman Antitrust Act.
"2. Whether a claimed violation of the Sherman Antitrust Act which falls within the regulatory scope of the National Labor Relations Act is within the exclusive primary jurisdiction of the National Labor Relations Board."
[4] To be distinguished are the pre-emption cases in which the possibility that the Board may not exercise jurisdiction renders state courts no less powerless to act, see San Diego Building Trades Council v. Garmon, 359 U. S. 236, 245-246. See generally, Teamsters Local 20 v. Morton, 377 U. S. 252.
[5] The crucial determinant is not the form of the agreemente. g., prices or wagesbut its relative impact on the product market and the interests of union members. Thus in Teamsters Union v. Oliver, 358 U. S. 283, we held that federal labor policy precluded application of state antitrust laws to an employer-union agreement that when leased trucks were driven by their owners, such owner-drivers should receive, in addition to the union wage, not less than a prescribed minimum rental. Though in form a scheme fixing prices for the supply of leased vehicles, the agreement was designed "to protect the negotiated wage scale against the possible undermining through diminution of the owner's wages for driving which might result from a rental which did not cover his operating costs." Id., at 293-294. As the agreement did not embody a " `remote and indirect approach to the subject of wages' . . . but a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract," id., at 294, the paramount federal policy of encouraging collective bargaining proscribed application of the state law. See also Meat Drivers v. United States, 371 U. S. 94, 98; Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc., 311 U. S. 91.
[6] One issue, for example, would be whether the restraint was unreasonable. Judicial pronouncements regarding the reasonableness of restraints on hours of business are relatively few. Some cases appear to have viewed such restraints as tantamount to limits on hours of work and thus reasonable, even though contained in agreements among competitors. Thus in Chicago Board of Trade v. United States, 246 U. S. 231, the Court upheld a rule of a grain exchange that had the form of a restriction on prices of transactions outside regular trading hours but was characterized by the Court as a rule designed to shift transactions to the regular trading period, i. e., to limit hours of operation. The Court, per Mr. Justice Brandeis, stated:

"Every board of trade and nearly every trade organization imposes some restraint upon the conduct of business by its members. Those relating to the hours in which business may be done are common; and they make a special appeal where, as here, they tend to shorten the working day or, at least, limit the period of most exacting activity." 246 U. S., at 241. (Emphasis added.) See also La Duc v. Teamsters & Chauffeurs Union, Local No. 43, 1946-1947 Trade Cas., ¶ 57,631 (Wis. Cir. Ct. 1947); Cielesz v. Local 189, Amalgamated Meat Cutters, 25 Ill. App. 2d 491, 167 N. E. 2d 302 (1960).
Other cases have upheld operating-hours restraints in factual circumstances that make it seem likely that the agreement affected hours of operation and hours of work in equal measure but without stressing that fact. See Dunkel Oil Corp. v. Anich, 1944-1945 Trade Cas., ¶ 57,306 (D. C. E. D. Ill. 1944); Baker v. Retail Clerks Assn., 313 Ill. App. 432, 40 N. E. 2d 571 (1942); Stovall v. McCutchen, 107 Ky. 577, 54 S. W. 969 (1900).
Kold Kist, Inc. v. Amalgamated Meat Cutters, Local No. 421, 99 Cal. App. 2d 191, 221 P. 2d 724 (1950), held unreasonable a union-employer agreement limiting night sales of frozen poultry, which had previously been obtained from the plaintiff-distributor. The plaintiff alleged, however, that it had been severely affected, since many stores had stopped carrying its products entirely due to the lack of storage facilities in which to keep the poultry during hours in which sale was prohibited, and such effects may be atypical.
The decided cases thus do not appear to offer any easy answer to the question whether in a particular case an operating-hours restraint is unreasonable.
[7] In 1959, and again in 1961, new collective bargaining agreements containing the challenged provision were executed. In each instance, Jewel reserved its position with respect to this litigation.
[1] For these policies, John L. Lewis, the long-time head of the Mine Workers, has been variously condemned and praised. See, e. g., Baratz, op. cit. supra, at 138-151; Folliard, op. cit. supra; Alinsky, John L. Lewis 346-372 (1949); Wechsler, Labor Baron: A Portrait of John L. Lewis (1944). Among the praise has been a Presidential Medal of Freedom, awarded on September 14, 1964, in which Mr. Lewis was cited as follows: "Eloquent spokesman of labor, he has given voice to the aspirations of the industrial workers of the country and led the cause of free trade unions within a healthy system of free enterprise."
[2] The legislative history is well summarized in Berman, Labor and the Sherman Act 3-54 (1930). See also Frankfurter & Greene, The Labor Injunction 139, n. 17 (1930).
[3] One of the expressed aims of the Act appears to have been approval of such union-employer agreements as "the protocol in the sweated industries of New York City and vicinity which abolished sweatshops and long hours of labor, and the burdensome, miserable toil prevailing, and established the combination of employers and of work men and work women by which certain standards are to be enforced, and [which provided that] no employer can become a member of the manufacturers' association in that trade unless he is willing to undersigned an agreement by which the conditions prevailing in the protocol will be inaugurated by him." H. R. Rep. No. 627, 63d Cong., 2d Sess., 15; S. Rep. No. 698, 63d Cong., 2d Sess., 11. This quotation was a part of the statement of Samuel Gompers to the House Committee in which he argued for adoption of a labor exemption to the Sherman Act. He stated his fear that while he did not believe that courts would declare the existence of labor unions per se to be violations of the Sherman Act, he believed that such protocols as the one discussed above would be held unlawful and stated that the manufacturers' association involved had already been sued. He was therefore seeking a congressional enactment declaring such a protocol lawful both for labor and business. It is significant that in both Senate and House Reports, almost the entire discussion of § 6 of the Clayton Act consists of this extract from Mr. Gompers' testimony. The inference is inescapable that the Clayton Act was designed, inter alia, to immunize such protocols from antitrust liability.
[4] As the House Committee stated in reporting out the Norris-LaGuardia Act, "[t]he purpose of the bill is to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act, October 15, 1914 (38 Stat. L., 738), which act, by reason of its construction and application by the Federal courts, is ineffectual to accomplish the congressional intent." H. R. Rep. No. 669, 72d Cong., 1st Sess., 3; see also id., at 7-8.
[5] In reaching this conclusion the Court relied, in part, on the provision of § 6 of the Clayton Act that "the labor of a human being is not a commodity or article of commerce . . . nor shall such [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in the restraint of trade under the antitrust laws." 310 U. S., at 503. It also relied on provisions of the Norris-LaGuardia Act, the Railway Labor Act, 48 Stat. 1185, as amended, 45 U. S. C. § 151 et seq. (1958 ed.), the National Labor Relations Act, the Walsh-Healey Act, 49 Stat. 2036, as amended, 41 U. S. C. §§ 35-45 (1958 ed.), and the Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. §§ 201-219 (1958 ed.). Its conclusion was that "[t]his series of acts clearly recognizes that combinations of workers eliminating competition among themselves and restricting competition among their employers based on wage cutting are not contrary to the public policy." 310 U. S., at 504, n. 24.
[6] The Court clarified this statement by citation to United States v. Brims, 272 U. S. 549, a case involving an employer conspiracy to allocate markets. See Bedford Co. v. Stone Cutters Assn., 274 U. S. 37, 56, 64 (dissenting opinion of Mr. Justice Brandeis). This, of course, is quite similar to the situation presented in Allen Bradley Co. v. Union, 325 U. S. 797. It is far different from the situations in the cases decided today and the situation in the garment industry which was specifically approved by Congress in the Clayton Act. See note 3, supra.
[7] Cf. the opinion of my Brother WHITE in Jewel Tea, ante, at 688-689, 692-693; infra, pp. 727-729, United States v. Brims, 272 U. S. 549, discussed in note 6, supra.
[8] See, e. g., H. R. 3020 §§ 301 (a), (b), 80th Cong., 1st Sess.; S. Rep. No. 105, 80th Cong., 1st Sess., 22; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 65; 93 Cong. Rec. A844-A846, A1910, 1834-1844, 3834-3836, 4130-4136, 4858-4875, 7347; S. 2573, 87th Cong., 1st Sess.; Sovern, Some Ruminations on Labor, the Antitrust Laws and Allen Bradley, 13 Lab. L. J. 957 (1962).
[9] As this case does not involve an Allen Bradley situation, it is not necessary to determine whether Congress, in enacting these Taft-Hartley boycott and related revisions to the Act and at the same time rejecting an attempted codification of the Allen Bradley doctrine in the antitrust laws, intended that all union activities in this area be covered solely under the comprehensive regulation of the labor statutes with their restricted injunctive and damage provisions. See sources cited in note 8, supra. Cf. Teamsters Union v. Lester Morton Trucking Co., 377 U. S. 252; Teamsters Union v. Oliver, 358 U. S. 283; Garner v. Teamsters Union, 346 U. S. 485.
[10] As an antitrust issue, see United States v. Hutcheson, supra.
[11] As an antitrust issue, see United States v. Hod Carriers, 313 U. S. 539, affirming United States v. Carrozzo, 37 F. Supp. 191 (D. C. N. D. Ill.).
[12] As antitrust issues, see United States v. Building & Construction Trades Council, 313 U. S. 539.
[13] In Pennington the collective bargaining agreement restricted subleasing, which is a mining form of subcontracting. Indeed, the Pennington case bristles with potential unfair labor practices. The Mine Workers allegedly imposed the national wage agreement on the small coal operators at a time when the Union did not represent their employees. For a minority union to enter into a collective bargaining contract covering all the employees of a unit has been held to infringe the rights of employees under § 7 of the NLRA. Garment Workers v. Labor Board, 366 U. S. 731. A "protective wage clause" in the national wage agreement provided that signatory companies would not buy coal mined under terms and conditions less favorable than those in the national wage agreement. The Labor Board has held that this type of clause violates § 8 (e) of the NLRA, as amended, 29 U. S. C. § 158 (e) (1958 ed., Supp. V). See Raymond O. Lewis, W. A. Boyle & John Owens, etc., 144 N. L. R. B. 228. See also Raymond O. Lewis et al., 148 N. L. R. B. ___, 1964 CCH, N. L. R. B. Decisions ¶ 13,334.
[14] See pp. 700-701, supra; Apex Hosiery Co. v. Leader, supra
[15] 52 Stat. 1060, as amended, 29 U. S. C. §§ 201-219 (1958 ed.).
[16] 49 Stat. 2036, as amended, 41 U. S. C. §§ 35-45 (1958 ed.).
[17] 46 Stat. 1494, as amended, 40 U. S. C. § 276a (1958 ed.).
[18] Although I agree with my Brother WHITE in Jewel Tea that the doctrine of primary jurisdiction does not apply here, decisions of the Labor Board as to what constitutes a subject of mandatory bargaining are, of course, very significant in determination of the applicability of the labor exemption.
[19] See, e. g., Weber v. Anheuser-Busch, Inc., 348 U. S. 468; Garner v. Teamsters Union, 346 U. S. 485, 490-491. Although Allen Bradley held that the Clayton and Norris-LaGuardia Acts precluded federal courts from enjoining activities concerned with even some nonmandatory subjects of bargaining, Congress has since provided that union insistence on bargaining over nonmandatory subjects is an unfair labor practice, cf. Labor Board v. Wooster Division of Borg-Warner Corp., 356 U. S. 342, and thus the Labor Board can order the union to cease and desist from such insistence as well as from auxiliary conduct like strikes designed to effectuate it; see Local 164, Brotherhood of Painters v. Labor Board, 110 U. S. App. D. C. 294, 293 F. 2d 133.
[20] Today, between 80% and 100% of the workers under union agreement are covered by multi-employer contracts in such important industries as men's and women's clothing, coal mining, building construction, hotel, longshoring, maritime, trucking, and warehousing Between 60% and 80% of unionized workers are under multi-employer pacts in baking, book and job printing, canning and preserving, textile dyeing and finishing, glass and glassware, malt liquor, pottery and retail trades. See Reynolds, Labor Economics and Labor Relations 170 (3d ed. 1959). Furthermore, in some other major industries relatively uniform terms of employment are obtained through the negotiation of a contract with one leading employer and the subsequent acceptance of that contract's key provisions, with only minor modifications by the other employers in the industry. See Chamberlain, Collective Bargaining 259-263 (1951).
[21] Section 6 of the Clayton Act. See p. 701, supra.
[22] See, e. g., Coronado Coal Co. v. United Mine Workers, 268 U. S. 295 (union primary strike activities in an organizational campaign enjoined on the grounds that the "purpose" of the organizational campaign was to prevent nonunion coal from undercutting union coal): United States v. Railway Employees' Dept., 283 F. 479 (D. C. N. D. Ill.) (primary strike against railroad held invalid on the ground that it interrupted commerce); Bedford Co. v. Stone Cutters Assn., 274 U. S. 37 (union's unilateral refusal to work on nonunion goods held invalid).
[23] See Exec. Orders Nos. 9250 and 9328, 7 Fed. Reg. 7871, 8 Fed. Reg. 4681, promulgated pursuant to the Act of October 2, 1942, 56 Stat. 765.
[24] Section 6 of the Clayton Act. See p. 701, supra.
[25] The Court in Pennington states that it "cannot conclude that the national labor policy provides any support" for agreements whereby unions undertake to attempt to obtain uniform terms from other employers in the industry. Pennington, ante, at 667. In making this statement the Court ignores clear congressional expressions in §§ 6 and 20 of the Clayton Act, the Norris-LaGuardia Act, the Fair Labor Standards Act, the Walsh-Healey Public Contracts Act, the Davis-Bacon Act, and the express purpose of the National Labor Relations Act. See generally, pp. 709-713, supra. Moreover, the Court's reliance on three old Labor Board cases for its conclusions is clearly misplaced. These cases hold, at most, as the Court itself recognizes, that an employer may not refuse to recognize a union chosen by his employees or refuse to sign any contract until such time as the union has successfully organized the employer's competitors. Such situations, of course, are completely different from the situation in which an employer with established collective bargaining relations voluntarily agrees with the union that the union will attempt to have other employers accept similar or uniform terms. They also are completely different from the situation in which an employer signs a collective bargaining agreement the terms of which contain a "most favored nation" clause, or labor standards on a sliding scale adjusted to the average or some other prevailing wage standard.
[26] It is clear that the small service butcher shops cannot operate at night without butchers on duty. There is no doubt that the Union could bargain with them as to the hours its members worked.
[27] See, e. g., Hearings before a Subcommittee of the Senate Committee on Interstate Commerce on S. 1417, 74th Cong., 1st Sess.; Hearings before the Senate Committee on Interstate Commerce on S. 4668, 74th Cong., 2d Sess.; Hearings before a Subcommittee of the Senate Committee on Interstate Commerce on S. 1, 75th Cong., 1st Sess.; Hearings before a Subcommittee of the House Committee on Education and Labor, Welfare of Miners, 80th Cong., 1st Sess.; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare on S. Res. 274, 81st Cong., 2d Sess.; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare, Causes of Unemployment in the Coal and Other Domestic Industries, 84th Cong., 1st Sess.
[28] See pp. 712-713, supra.
[29] See notes 8, 9, supra, and accompanying text.
[*] The Allen Bradley decision has been reaffirmed and approved by the Court on numerous occasions. See Brotherhood of Carpenters v. United States, 330 U. S. 395, 400, 411; United States v. Women's Sportswear Assn., 336 U. S. 460, 464; Giboney v. Empire Storage Co., 336 U. S. 490, 497; United States v. Employing Plasterers Assn., 347 U. S. 186, 190; Teamsters Union v. Oliver, 358 U. S. 283, 296; Meat Drivers v. United States, 371 U. S. 94, 99-101.